THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | |
| | : | |
| DWIGHT D. YORK, a/k/a | : | Case No. 5:02-CR-27 (CAR) |
| MALAKAI Z. YORK, | : | 28 U.S.C. § 2255 |
| ISA MUHAMMAD, and | : | |
| ISA ALIHAD MAHDI, | : | |
| | : | |
| Defendant. | : | |

*ORDER ON MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE*

On January 23, 2004, following fourteen days of trial, a federal jury returned a verdict of guilty against Petitioner Dwight D. York ("York") on ten counts of an eleven count Indictment. On Counts One and Two, York was convicted of one count of conspiracy to commit racketeering violations and one count of racketeering under the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962. On Count Three he was convicted of one count of conspiracy to transport minors in interstate commerce for unlawful sexual activity and to commit structuring of cash transactions. On Counts Four, Five, and Six he was convicted of transporting minors in interstate commerce for unlawful sexual activity. On Count Seven he was convicted of traveling in interstate commerce to engage in unlawful sexual activity with minors. On Counts Nine, Ten, and Eleven, he was convicted of structuring cash transactions to evade currency transactions reporting requirements. He was acquitted of Count Eight, which alleged a charge of transporting minors in interstate commerce for unlawful sexual activity, in connection with a trip to Walt Disney

1

World in Orlando, Florida.  York appealed his conviction and sentence to the United States Court of Appeals for the Eleventh Circuit, which affirmed his conviction and sentence and entered a final judgment of conviction on January 6, 2006.   His petition for writ of certiorari to the United States Supreme Court was denied.

One year after the denial of his petition for writ of certiorari, York filed the present Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255.  His initial motion, filed by counsel, appears to state seven claims for relief, as follows:

[1] At sentencing, counsel failed to properly preserve an argument based upon the decision issued in Blakely v. Washington.

[2] On appeal, counsel was ineffective in that, during oral arguments, counsel made false claims that the Blakely- Booker issue had been preserved at the lower level. In doing so, appellate counsel failed to argue that the standard of review utilized by the Court of Appeals was erroneous.

[3] Trial counsel was also ineffective at trial because he was unprepared to try this complex multi-count prosecution, ill-prepared to address the expert witnesses presented by the government, ill-equipped to provide legal representation in a matter of this magnitude, ineffective insofar as the directive and desires of the Petitioner were ignored, and because the post-trial counsel's actions were totally inconsistent with the wishes of the Petitioner, when he withdrew the Petitioner's motion for new trial despite the merits of the issues raised therein and without advising Petitioner that such action was being taken.

[4] In addition, Petitioner was deprived of effective legal representation when the Court, in violation of the 6th Amendment, forced the Petitioner to have counsel that had been fired to continue in a representative capacity.

[5] Moreover, Petitioner was deprived of a fair trial as a result of the Court's clear bias as gleaned from its inappropriate visits to Internet Web sites for the purpose of conducting independent research regarding the Petitioner and his affiliations.

[6] . . .[S]everal witnesses of serious impact have now recanted their testimony and advised of serious prosecutorial misconduct calling the Petitioner's entire conviction into question particularly in light of the fact that trial counsel was both ill-prepared and ill-equipped at the time of trial to go forward and/or completely advance the Petitioner's interest.

[7] Furthermore, the Court had no jurisdiction to convene or conduct a trial of the defendant due to his status as a Liberian diplomat.

Although the Motion and the Amended Motion describe these seven claims for relief in their opening paragraphs, the briefs present argument only as to the first four claims, all related to alleged ineffective assistance of counsel.  The Government's Response likewise addresses only the claims related to ineffective assistance of counsel.  The Report and Recommendation of the United States Magistrate Judge is also concentrated on the ineffective assistance of counsel claims, and does not deal with the fifth and sixth claims.  These claims are first addressed in detail in York's Objection to the Report and Recommendation, submitted by York *pro se*, and are restated and enlarged in various subsequent *pro se* motions and requests for "judicial notice."

A petition for relief under Section 2255 is a collateral attack on a sentence or conviction, distinguishable from a direct appeal.  Section 2255 authorizes a prisoner in custody under federal sentence to file a motion in the court which imposed the sentence and to challenge the sentence on any of four different grounds: "(1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose such sentence; (3) that the sentence was in excess of the maximum authorized by law; and (4) that the sentence is otherwise subject to collateral attack."  United States v. Jordan, 915 F.2d 622, 625 (11th Cir. 1990)(quoting Hill v. United States, 368 U.S. 424, 426-27 (1962)).  A collateral attack under Section 2255 is not a second appeal or an avenue to challenge any error of law in the conduct of a case.

3

Instead, it is restricted to "exceptional circumstances," that is, claims for relief based on lack of jurisdiction, constitutional error, or errors of law that constitute "a fundamental defect which inherently results in a complete miscarriage of justice." Hill, 368 U.S. at 428; see also United States v. Addonzio, 442 U.S. 178, 185 (1979).

## I.      Claims of Ineffective Assistance of Counsel

With regard to the claims of ineffective assistance of counsel, the Report and Recommendation is thorough and well-reasoned and needs no revision. It is hereby **ADOPTED** in full and incorporated into this Order by reference. Some additional observations are warranted, however, based on this Court's intimate acquaintance with this case over the past six years.

Throughout the long history of this case, York has continuously had access to the best attorneys money can buy. For almost two years, from his initial arrest until shortly before trial, York retained as his lead counsel Edward Garland, who is one of the most highly regarded criminal defense attorneys in the State of Georgia and who has a nationwide reputation due to his representation of various sports and entertainment figures in high-profile cases. After his guilty plea was rejected, York expressed dissatisfaction with Mr. Garland's representation, apparently based on Mr. Garland's request for a psychological evaluation and on his unwillingness to file various motions and defenses requested by York. York then found another nationally-known attorney, Frank Rubino of south Florida, who entered an appearance in the case *pro hac vice* and filed various motions at York's request. These motions included a motion to withdraw the request for psychological evaluation and a motion to dismiss based on York's various claims of immunity from prosecution due to his sovereign status as "Maku 'Chief': Black Thunderbird (Eagle)," recognized as "the Commander in Chief and Head of State of the Indigenous Yamassee Native American

4

Government according to the Constitution of the United Nuwaubian Nation of Moors." Motion to Dismiss p. 4, 6 (Doc. 142).

Mr. Rubino never officially withdrew his representation of York.  He appeared, along with Mr. Garland and Mr. Garland's associate Mr. Arora, at a status conference on August 5, 2003, at which the Court proposed to schedule the trial of the case for November 3, 2003.  Mr. Rubino objected to this proposed date based on conflicts with various cases previously scheduled for trial in the Southern District of Florida.  After the status conference, Mr. Rubino filed a formal motion requesting a continuance of the case until January 2004 (Doc. 138).  That motion was granted and trial was scheduled to begin on January 5.  Although Mr. Rubino filed several additional motions prior to trial, he did not appear at pretrial conferences on December 16, 2003, and December 30, 2003.  His last activity in the case was the filing of two motions to dismiss and a motion to sever on December 8, 2003.

Approximately a month before trial, York expressed to the Court that he wished to terminate Mr. Garland and retain the services of attorneys Adrian Patrick and Benjamin Davis for trial of the case.  Mr. Garland was allowed to withdraw and Mr. Patrick became York's lead trial counsel.  Mr. Garland's associate, Manubir Arora, was directed by the Court to remain in the case in an advisory capacity during the first week of trial.  After trial, York retained an attorney from New York City, Jonathan Marks, to represent him in his Motion for New Trial.  Dissatisfied with Marks' performance and the denial of his Motion for New Trial, York again retained Mr. Patrick to represent him on appeal.  Currently, York is represented by two attorneys from Washington, D.C., and one attorney from Atlanta.  Throughout the case and the numerous changes in representation, it has been apparent that York himself has exercised a great deal of control over litigation strategy.

Although the outcome of this case was not what York desired, the record of the case does not support his claims of ineffective assistance of counsel.  The Sixth Amendment to the United States Constitution does not guarantee every defendant an acquittal.  As the Supreme Court has explained, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland v. Washington, 466 U.S. 668, 686 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance."  Id. at 687.  This standard is "highly deferential" to the attorney's performance:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

Id. at 689.

The record in this case conclusively shows that York received effective representation from all his various attorneys throughout the litigation of this case, during pre-trial proceedings and motions practice, at trial, and through post-conviction proceedings and appeal.  His trial counsel displayed a comprehensive knowledge of the facts and issues in the case and mounted a vigorous defense.  Counsel thoroughly cross-examined the Government's witnesses, raising questions as to the Government's conduct of the investigations, the motivations for witnesses' testimony, and inconsistencies between testimony and other evidence.  Counsel also presented the testimony of

forty-four witnesses on York's behalf, including the testimony of eight alleged victims in the case who denied abuse, and the testimony of the parents of some alleged victims, who testified that their children were not being truthful.  The defense raised theories that the charges against York were orchestrated by disgruntled former members of York's religious communities in concert with law enforcement officials who wanted York's community removed from Putnam County.  In putting forth this vigorous defense, York's counsel far exceeded the minimum constitutional standard of "reasonably effective assistance" and rendered the trial "a reliable adversarial testing process." Strickland, 466 U.S. at 688.

## II.     Claims of Judicial Bias

York's Motion to Vacate and Amended Motion both state the general claim that the Court demonstrated bias against him, as "gleaned from its inappropriate visits to Internet Web sites for the purpose of conducting independent research regarding the Petitioner and his affiliations."  Def.'s M. to Vacate 2 (Doc. 382).  The motions and briefs presented by counsel do not provide any further detail or allegation as to this claim of judicial bias.  That detail only comes in the Objection to the Report and Recommendation, submitted by York acting *pro se*.  In his Objection, York states that

> on January 7th, 2004 between the hours of 3:00 pm and 4:30 pm Judge Ashley Royal displayed a personal bias against the Defendant, as a result of being handed an email from a Nuwaubian by the Government; after reading the email Judge Royal stated: "I didn't have to read this, it's the same stuff that I was looking at on their website last night."

Def.'s Objection 22 (Doc. 407).  The Court has been unable to locate this specific statement in the transcript of the trial, but does not dispute that such a statement may have been made.

In his Objection, York adds two new allegations of judicial bias.  First, he alleges that the Court was biased  because the undersigned judge, prior to his appointment, acted as an attorney for Oconee Regional Medical Center during the trial of a medical malpractice case brought by Shalimah Richardson, who York claims is his common law wife.[1]  Second, he alleges that the Court demonstrated racial bias by holding trial proceedings on the federal holiday honoring the birthday of Martin Luther King, Jr.

Because these arguments regarding judicial bias are raised for the first time in York's Objection to the Report and Recommendation, they need not be considered by the Court.  When considering objections to a report and recommendation under 28 U.S.C. § 636(b)(1), a district court has broad discretion, and may decline to consider arguments that were not first presented to the magistrate judge.  Williams v. McNeil, 557 F.3d 1287, 1291 (11th Cir. 2009).  In this case, the Court has exercised its discretion to take York's untimely arguments into consideration, despite the lack of opportunity for the Government to respond to them or for the Magistrate Judge to consider them.  Taking those arguments into consideration, the Court finds that they are without merit.

The specific facts stated by York in his Objection – related to the Court's monitoring of a website published by York's followers, related to the Court's representation of a party opposed to York's common law wife in an unrelated civil case, and related to the conduct of trial proceedings on Martin Luther King, Jr.'s birthday – do not establish an inference of bias sufficient to raise a due process claim.  Claims of judicial bias raised on a collateral attack under Section 2255 arise under the due process clause of the Fourteenth Amendment.  See Davis v. Jones, 506 F.3d 1325 (11th Cir. 2007); United States v. Couch, 896 F.2d 78 (5th Cir. 1990).  In the context of a collateral attack under

_____

[1]Throughout the proceedings in this case, a number of different women, including co-defendant Kathy Johnson, have been described as wives of York.

Section 2255, a defendant must show that there was actual or potential bias that "rose to the level of a 'fundamental defect' resulting in 'a complete miscarriage of justice.'" Couch, 898 F.2d at 81. "All questions of judicial qualification may not involve constitutional validity." Tumey v. Ohio, 273 U.S. 510, 523 (1927). Indeed, "[m]ost matters relating to judicial disqualification [do] not rise to a constitutional level." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-22 (1986)(quoting FTC v. Cement Inst., 333 U.S. 683, 702 (1948)). "Thus matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion." Tumey, 273 U.S. at 523.

In the context of federal courts, Congress has exercised its legislative discretion in enacting the judicial disqualification statute found at 28 U.S.C. § 455. The statutory provisions for disqualification outlined in Section 455 are more extensive and restrictive than the constitutional requirements of due process, however, and are not binding in a collateral attack. Id.; United States v. Alabama, 828 F.2d 1532, 1540 n. 22 (11th Cir. 1987) ("the statutory grounds for disqualification are stricter than the requirements of due process"). The statutory provisions of Section 455 apply to questions of judicial disqualification raised during the trial and pre-trial proceedings, or on direct review. During pre-trial proceedings and at trial in this case, York made numerous motions for the Court to recuse itself. He did not assign error to the denial of these motions during his direct appeal.

The constitutional right to due process protects a criminal defendant from trial before a court that has actual bias or a potential bias that would threaten the defendant's opportunity for a fair trial. With regard to actual bias, the Supreme Court has concluded that "it certainly violates the Fourteenth Amendment ... to subject [a person's] liberty or property to the judgment of a court the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against

him in his case." <u>Tumey</u>, 273 U.S. at 523.  In this case, York does not allege that the Court had any

direct, personal, substantial pecuniary interest in the outcome of the case, and the Court did not in

fact have any such interest.

With regard to merely potential bias, the extent to which "appearance of partiality" can

amount to a violation of due process is less than clear.  See <u>Davis</u>, 506 F.3d 1325.[2]  The Supreme

Court has offered a "reasonable formulation" of the inquiry that is somewhat vague, suggesting that

courts consider whether "the situation is one 'which would offer a possible temptation to the average

. . . judge to . . . lead him not to hold the balance nice, clear, and true.'"  <u>Aetna</u>, 475 U.S. at 822

(quoting <u>Ward v. Village of Monroeville,</u> 409 U.S. 57, 60 (1972)).  The Fifth Circuit in <u>Couch</u> read

this formulation to create a distinction between the due process inquiry and the statutory inquiry

under Section 455:

> The inquiry commanded by section 455 and that commanded by the Due Process
> Clause are not the same. The Due Process Clause requires a judge to step aside when
> a reasonable judge would find it necessary to do so. Section 455 requires
> disqualification when others would have reasonable cause to question the judge's
> impartiality. It is this additional, systemic concern for avoiding the appearance of
> impropriety that makes the section 455 standard for disqualification more demanding
> than that imposed by the Due Process Clause.  At some point the two tests overlap.

896 F.2d at 81.

In this case, it is not necessary to survey the murky border between due process and Section

455 because the allegations set forth in York's Motion and in his Objection to the Report and

---

[2]Because <u>Davis</u> concerns a petition for collateral review of a state conviction under 28 U.S.C. § 2254, its
analysis is "confined to determining whether the state court decision was an unreasonable application of clearly
established federal law as determined by the decisions from the Supreme Court."  506 F.3d at 1336.  In <u>Davis</u>, the
judge in question was the brother of one of the prosecuting attorneys.  After a review of Supreme Court cases related
to due process and judicial bias, the court concluded that "[t]here is simply no Supreme Court holding establishing
that the type of appearance problem alleged here violates the Due Process Clause."  <u>Id.</u>

Recommendation do not indicate disqualifying bias even under the more stringent standards of Section 455.  Generally, Section 455 requires a judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  Section 455(b) describes five specific situations in which disqualification is warranted:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

11

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

The three instances alleged by York, concerning the Court's monitoring of internet sites operated by York's followers, the Court's prior representation of a defendant hospital in a medical malpractice case brought by York's wife, and the conduct of trial proceedings on the Martin Luther King, Jr., Holiday, do not reasonably call into question the Court's impartiality in the proceedings and do not correspond with any of the five specific types of bias described in Section 455(b).

The Court's monitoring of internet sites was associated with the unusual security preparations required for the trial of this case. On January 2, 2004, the Court entered an order setting forth detailed findings of fact related to the activities of York's followers in the months prior to trial. See, Order on Trial Security Procedures (Doc. 217). The Court observed that York's followers had "shown an organized and concerted effort to influence the potential jury at a level never seen or heard of by this Court in thirty years of experience in the law." Doc. 217 at 13. Their activities included frequent protests and demonstrations at the courthouse in Macon and in various locations in Brunswick,[3] the distribution of flyers concerning the case to citizens in Brunswick, and, most troubling, threatening emails to former members of York's community who were potential witnesses in the case. Their activities also included a constant stream of information published on the internet, primarily on the website www.unnm.com, including accusations and attacks against government witnesses, prosecutors and law enforcement personnel, and the Court. A typical example of the sort of information published on the website is the attached Exhibit, titled "Bulletin!

---

[3]As an exhibit to this Order, the Court has entered into the record a disc with footage of a representative protest, conducted on December 23, 2003, in response to a Government motion to partially close the Courtroom. The footage was taken by an officer of the United States Marshal's Office. Similar demonstrations occurred with some frequency throughout the year preceding the trial.

Bulletin Bulletin! The Reason why Judge Royal hates the Yamassee so much !!!  It's in his blood !!!"  The Court printed this article from the website on January 6, 2004.  The article contends that the Court was biased against York because the undersigned's great, great, great grandfather fought against the Creek Indians in the Second Creek War of 1836.[4]  In its January 2, 2004 Order, the Court stated on the record that it had been monitoring the website on a regular basis, to keep informed on potential threats to Court security and to the integrity of the trial.

The Court's monitoring of this website, along with other security precautions in the case, is not an indication of any actual or potential bias against York.  Courts normally will have access to information beyond that which is presented to the jury at trial.  In this case, there were extensive pretrial motions that provided a great deal of background information to the Court long before trial.  Much of the information on the Nuwaubian website was also presented formally to the Court in briefs on various pre-trial motions, particularly in the motions submitted by Mr. Rubino at York's request.  Much of the information on the website was irrelevant to the case and concerned only various conspiracy theories or elements of the Nuwaubian worldview.  The most important information, from the Court's perspective, was information related to any efforts to influence the trial of the case.  The Court's only concern in monitoring the website was to ensure the security of the trial proceedings and to protect the jury panel from any potential contamination.

Although the Court expressed concerns about York's followers and their activities, these concerns did not produce a personal bias warranting recusal under the statutory standards of Section 455.  It is unavoidable that courts will form opinions and make judgments about the character and

_____

[4]Upon reading this account on the Nuwaubian website, the undersigned confirmed through family members that the research conducted by York's followers was accurate.  Other information published on the website indicated that York's followers had been conducting additional research about the Court's personal affairs.

13

credibility of various parties during the course of proceedings.  Indeed, it is often a part of the job of judging.  See Liteky v. United States, 510 U.S. 540, 551 (1994) (quoting In re J. P. Linahan, Inc., 138 F.2d 650, 654 (2nd Cir. 143) ("Impartiality is not gullibility.  Disinterestedness does not mean child-like innocence.  If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions")).  Sometimes these opinions or judgments may be unfavorable.  To warrant disqualification, then, the court's opinions or conclusions must arise from an "extrajudicial source" or be so deep-seated and pervasive as to make fair judgment impossible. Id. at 555.  "A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune."  Id. at 556.

In this case, the Court's administration of security concerns, including the monitoring of the Nuwaubian websites, had no impact on the process of the trial itself.  Given the long experience of this Court with York's followers in the years prior to the trial, it would have been a dereliction of duty for the Court to fail to monitor the websites.  The record shows that the Court made no reference in the presence of the jury to any information gleaned from the websites, and made no unfavorable remarks regarding York or his case in the presence of the jury.  It would be difficult even to characterize the Court's courtroom administration as "stern and short-tempered," even when counsels' tempers sometimes flared during the frequent, contentious debates regarding evidentiary matters.

In his Objection to the Report and Recommendation, York raises the new claim that the Court was biased because the trial judge, prior to his appointment to the bench, represented a party adverse to York's purported wife in a civil suit in the Superior Court of Baldwin County.  As York correctly states, the undersigned represented Oconee Regional Medical Center in defending a

14

medical malpractice claim brought by Shalimah Richardson and Laverne Richardson, involving the alleged wrongful death of Eli Richardson.  The Richardsons were or are members of York's organization.  According to York, Eli Richardson was "at one time known as the leader of our tribe." Objection 18 (Doc. 407).  York states that Shalimah Richardson is or was his common-law wife and is the mother of three of his children.[5]

The trial judge's participation in this unrelated litigation does not constitute a disqualifying factor under 28 U.S.C. § 455, much less a violation of York's due process rights.  Section 455 provides that a judge shall disqualify himself "[w]here in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it."  28 U.S.C. § 455(b)(2).  This specific provision does not apply in this case because the Richardson malpractice case was not "the matter in controversy" in this case and has no relationship to the criminal charges brought against York in this case.

The more general provisions of Section 455(a), requiring a judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned," also does not apply.  "A judge's prior representation of one of the parties in a proceeding . . . does not automatically warrant disqualification."  United States v. Lovaglia, 954 F.2d 811, 815 (2nd Cir. 1992).  In this case, the undersigned judge never previously represented any party in this case.  The Richardson malpractice case is related to York's criminal case only in that York has or had a relationship with one of the parties to the malpractice case.  The actual parties in interest and matters in controversy in the two

---

[5]In its presentence investigation, the Probation Office determined that York had at least 77 children by various different women.  At least three of the victims in the case – **[REDACTED]** – testified that they conceived children by York when they were seventeen or eighteen years old.  Their testimony was not disputed.

cases were completely different.  Oconee Regional Medical Center had no interest whatsoever in the criminal proceedings against York.

Nothing in the conduct of the malpractice case would cause the Court's impartiality to be reasonably questioned.  York himself suggests in his Objection that the undersigned's relations with the adverse parties in that case were cordial.  See, Objection 21 (Doc. 407) ("Chief Judge C. Ashley Royal recognized us dressed in distinct African and Native Nuwaupian Church dress code attire which is the most distinct attire of any community in the State of Georgia, we dress based on our 'African' and Native American ancestral garments.  Attorney Royal often nodded his head in greeting me during my wife's trial").[6]  "Where a case . . . involves remote, contingent, indirect or speculative interests, disqualification is not required" under Section 455.  Lovaglia, 954 F.2d at 815.

Finally, York contends that the Court displayed bias by conducting trial proceedings on the federal holiday celebrating the birthday of Martin Luther King, Jr.  York contends that the decision to conduct trial proceedings on the holiday was evidence of racial bias.  It was not.  That decision was motivated by purely practical concerns.  Throughout the trial, the Court expressed its interest in minimizing delays in the process, in order to reduce inconvenience to the jurors.  Because of the unusual security precautions required in this case, the inconvenience and expense of each additional day of trial was of special concern.  Pursuant to the Court's January 2, 2004 Order on Trial Security Procedures, the jury was kept anonymous to prevent any attempts to influence or harass them.  The United States Marshal's Office arranged to have the jurors meet each morning at an undisclosed location away from the Courthouse, to be driven in to the courthouse in a group.  The Marshal's

---

[6]York's recollection of the Richardson malpractice case differs from the Court's recollection.  The Richardson case was settled and never went to trial.  The undersigned does not recall seeing or meeting York during the litigation of that case, but likely would not have known him at the time.

Office and the Federal Police assigned a substantial number of additional personnel to provide security for the trial.  To minimize the inconvenience and expense, the Court elected to work through the holiday and to extend its normal trial hours each day.  The Court has conducted proceedings on a federal holiday in at least one other complex case, a six-week criminal trial in 2008 that included  proceedings on the Columbus Day holiday.  York was in no way prejudiced by the decision to go forward with trial five days a week, including one federal holiday.

### III.   Witness Affidavits

York contends that his sentence should be vacated because several witness have either recanted their testimony or have given affidavits alleging misconduct by the Government in the investigation and trial of the case.  With his Objection to the Report and Recommendation, York has submitted ten affidavits from alleged victims in the case.  Objection Ex. 11, 13 (Doc. 407).  Only four of the affidavits – from **[*WITNESS 1*]**, **[*WITNESS 2*]**, **[*WITNESS 3*]**, and **[*WITNESS 4*]** – can be properly characterized as recantations, in which a witness states that his or her testimony at trial was false.  The affidavit from **[*WITNESS 1*]** was previously submitted to the Court with York's Motion for New Trial.  At a dramatic hearing on the motion, **[*WITNESS 1*]** testified that her affidavit was false and that her trial testimony was all true.  One affidavit – from **[*WITNESS 5*]** – is from a witness who was called by the Government, but who denied any abuse by York.  His affidavit essentially restates his testimony at trial.  Three of the affidavits – from **[*WITNESS 6*]**, **[*WITNESS 7*]**, and **[*WITNESS 8*]** – are from witnesses who testified for the defense at trial, and essentially affirm their previous testimony.  The remaining affidavits – from **[*AFFIANT A*]** and **[*AFFIANT B*]** – are from alleged victims who did not testify at trial, but who state that they were improperly pressured by the Government or some other party to give false statements.  The

17

substance of their testimony is cumulative of evidence that was presented by numerous witnesses at trial.

The Court has reviewed these affidavits in comparison with the transcripts of the testimony of those witnesses who testified at trial, and finds that they are not sufficient to support a collateral attack under Section 2255 and do not require an evidentiary hearing.  The most detailed of the affidavits, that of **[*WITNESS 1*]**, was repudiated by its author under oath in live court.   The remaining affidavits are largely cumulative, restating matters that were thoroughly explored on direct and cross examination at trial.  Only three of the affidavits actually purport to refute testimony offered at trial, but these three affidavits are lacking in credibility, are primarily impeaching in nature, and are largely cumulative of evidence and testimony presented by other witnesses at trial. The new testimony of these three witnesses, subject to cross-examination based on their prior statements at trial and other impeaching evidence, would not substantially alter the totality of evidence presented at trial.

In the context of a motion for new trial, recanting affidavits are generally reviewed as "newly discovered evidence."  See United States v. Santiago, 837 F.2d 1545 (11th Cir. 1988).  As such, they must meet four prerequisites to warrant a new trial:

> (1) the evidence must be newly discovered and have been unknown to the defendant at the time of trial; (2) the evidence must be material, and not merely cumulative or impeaching; (3) the evidence must be such that it will probably produce an acquittal; and (4) the failure to learn of such evidence must be due to no lack of diligence on the part of the defendant.

Id. at 1550.  These same standards apply in the context of a collateral attack under Section 2255. Lynn v. United States, 365 F.3d 1225,  1237 (11th Cir. 2004)("[Section] 2255 motions based on new

evidence are subject to the standards generally applicable to motions for a new trial based on new evidence"). Some courts have held that on collateral attack, a defendant seeking relief on the basis that the conviction resulted from perjured testimony must also show that the Government knew such testimony was false. See Sears v. United States, 265 F.2d 301, 302 (5th Cir. 1959); See also, Davis v. Terry, 465 F.3d 1249, 1254 (11th Cir. 2006)(petition for *habeas corpus* review of state conviction under 28 U.S.C. § 2254).

Generally, "recantations are viewed with extreme suspicion by the courts." Santiago, 837 F.2d at 1550. Such testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) (quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984)(Brennan, J., dissenting)). "Skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon[,] such as when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story." United States v. Miner, 131 F.3d 1271, 1273-74 (8th Cir. 1997)(citations and punctuation omitted).

The affidavits presented by York in this case are not sufficient to merit a new trial. Each of the affidavits is examined in detail below. Examination of these affidavits and comparison with the witnesses' trial testimony shows that the bulk of the information set forth in the affidavits is consistent with evidence presented at trial. The affidavits are not even consistent with each other. Some of the witnesses state that they were pressured by the Government to give false testimony. Others testify that they were pressured by disgruntled former members of York's organization to

make statements against York.  Yet others testify that they were motivated to give statements against York by personal grudges.  Viewed collectively, their testimony is of insufficient weight to warrant a new trial or an order vacating the sentence.

Considerable evidence was presented at trial regarding allegations of the Government intimidating witnesses to testify.  On cross examination, Government witnesses were questioned about such tactics.  Numerous defense witnesses testified regarding attempts of law enforcement officers to intimidate them or coerce their testimony.  The defense called a series of witnesses to describe a terrifying "raid" of the Nuwaubian compound[7] in Eatonton by dozens of heavily-armed law enforcement officers.  The jury had the opportunity to weigh the credibility of the witnesses on the stand and evaluate their testimony in light of the allegations of Government misconduct.

There were allegations of intimidation and coercion on both sides of the case.  On the prosecution side, witnesses for the Government testified about attempts by family members or other followers of York to convince them to deny any sexual abuse.  Many of the witnesses had lived their entire lives in York's organization.  They had been raised to consider York a father figure or a religious leader.[8]  The evidence showed that a number of the Government's witnesses had close family members who remained loyal to York and his organization.  For example, the defense called witness **[REDACTED]**, mother of prosecution witness **[REDACTED]**, who testified that she

---

[7]Witnesses often referred to the Eatonton compound as "Tama Re" or, simply, "the Land."

[8]The witnesses for the defense were consistently evasive as to the nature of the York organization's doctrine and teachings.  Defense witnesses frequently insisted that York was simply one teacher among many, and that the primary purpose of their organization was "uplift."  The complete record of evidence, including the testimony of Government witnesses and documentary evidence from the organization itself, indicates that the doctrine of the organization was vague and shifting, but that it consistently focused on the central authority of York.  York took on various guises: an Indian chief; the descendant of Sudanese royalty; an Egyptian pharaoh; a Muslim imam; an alien from the planet Rizq; the incarnation of a seventy trillion year-old green light.  These various identities were reflected in York's propensity for elaborate costumes, theatrical displays, and linguistic allusions.

believed York's word over her daughter's allegations of abuse.  She maintained her faith in York even when confronted with medical evidence of sexual abuse.

Nothing in the affidavits presented by York significantly changes the balance of evidence presented at trial.  The Government presented fifty-three different witnesses, including fifteen victim witnesses who testified that York engaged in sexual activity with them as minors and that they witnessed York engaging in sexual activity with other children and adults.  The Government also presented one witness, **[*WITNESS 5*]**, who denied any sexual abuse by York.  The Defense called forty-four witnesses, including eight of the alleged victims in the case who denied any sexual abuse by York.  Each of these alleged victims, on both sides of the case, was thoroughly cross-examined as to motives for lying, as to any intimidation or coercion by agents of the Government or members of the York organization, as to prior inconsistent statements, and as to medical evidence that was consistent or inconsistent with their trial testimony.  The testimony offered in the affidavits is merely cumulative of volumes of evidence presented at trial.  The type of information set forth in the affidavits was submitted in substance and in detail at trial, tested by confrontation and cross-examination in the face of the jurors.  As is discussed below with reference to each specific witness, the affidavits submitted by York fail to set forth new information that would warrant an order vacating York's sentence under Section 2255.

A.     **Government Witnesses**

1.     **Affidavit of [*WITNESS 1*]**

The affidavit of **[*WITNESS 1*]** attached to York's Objection is dated April 23, 2004.  It appears to have been drafted by **[*WITNESS 1*]**'s personal attorney, Mr. Dwight Johnson, who also witnessed it as a notary public.  An edited and expanded version of this affidavit is dated May 9,

2004, and was presented to the Court on May 26, 2004, as an exhibit to York's Amended Motion for New Trial (Doc. 298). The amended affidavit is witnessed by Jonathan Marks, who at the time was York's attorney. In her affidavits, [**WITNESS 1**] denies any sexual contact with York as a child and states that she first began having sex with him when she was seventeen years old. She also contradicts her trial testimony regarding the financial structuring charges, affirming that she did commit structuring violations herself, but stating that she was instructed to do so by another member of the community, not by York. Nowhere in either affidavit does [**WITNESS 1**] state or suggest that law enforcement officers or the Government threatened her or intimidated her in any way. Instead, she explains that she was encouraged to testify against York by York's son, Jacob York, and that she initially approached the FBI at his suggestion.[9]

[**WITNESS 1**]'s affidavit has already been retracted by its author. [**WITNESS 1**] appeared before the Court on August 13, 2004, at a hearing on York's Motion for New Trial. On the witness stand, she testified that her affidavit was false. The Court's August 16, 2004 Order, denying York's Motion, describes the substance of [**WITNESS 1**]'s testimony:

> At the hearing on Defendant's motion, [**WITNESS 1**] testified that her trial testimony was truthful, and that her recanting affidavit was false. In the affidavit, [**WITNESS 1**] states that she did not have sex with Defendant prior to age 17 and that she never witnessed Defendant having sex with other children. This testimony contradicts her lengthy and detailed trial testimony of having begun sexual activity with Defendant at the age of thirteen and of having witnessed Defendant engaging in sexual activities with other children on frequent occasions. In the affidavit she also denies any knowledge of structuring financial transactions. [**WITNESS 1**]

---

[9]One of the defense theories presented at trial was that the allegations against York were part of a conspiracy orchestrated by Jacob York.

explained at the hearing that she made the affidavit voluntarily, and that she was not coerced, pressured, or promised any award for making it. She testified that she was motivated to make the false affidavit by her concern for Defendant and the sentence he received. She felt that he deserved a second chance and wanted to help him. Nevertheless, on the stand and under oath she testified that her statements in the affidavit were untrue, and affirmed her trial testimony in its entirety.

The Court has had the opportunity to observe the testimony of [*WITNESS 1*] both at trial and in the new trial hearing. At trial she testified for several hours and was extensively cross-examined. Her testimony was highly credible, both because of its detail and because of the witness's demeanor. Her testimony at the new trial hearing, if anything, served to enhance the credibility of her trial testimony. Again her demeanor was sincere and serious, and it was clear that her testimony was not motivated by animosity toward the Defendant. [*WITNESS 1*] was born into Defendant's organization and lived in his communities throughout her entire childhood. In those communities, Defendant was considered to be a leader with divine or semi-divine authority. [*WITNESS 1*] bore a child to Defendant at the age of seventeen. In her late teens and early twenties she rose to a level of significant responsibility for the financial affairs of the organization. Family members and friends were still a part of the organization at the time of trial. It is understandable that she still found it difficult and painful to speak against Defendant, and might still be motivated to assist him. At trial and in the hearing [*WITNESS 1*] displayed the demeanor of a person who was telling the truth at great personal cost.

Order on Motion for New Trial 1-3 (Doc. 347). [*WITNESS 1*]'s affidavit, which she has repudiated under oath, has no credibility and does not support a finding that York's conviction was violation of his constitutional rights. Indeed, it serves only to undermine the credibility of the other affidavits submitted by York, in that it illustrates the continuing influence York could have over his followers even after they left the organization.

      2.      **Affidavit of [*WITNESS 2*]**

[**WITNESS 2**] was called by the Government and testified on the fifth day of trial, January 9, 2004. [**WITNESS 2**] testified that York first sexually molested him on his seventh birthday, when he was living on a compound in upstate New York. He was relocated to the Nuwaubian compound in Eatonton, Georgia, when he was seven or eight years old. He testified that York continued to molest him in Eatonton and also molested other boys and girls in his presence. Regarding his meetings with law enforcement officers, [**WITNESS 2**] stated that he met with FBI Agent Joan Cronier voluntarily because he "wanted to speak up." T-1335 (Doc. 303). He denied that anyone pressured him to speak to Agent Cronier.

[**WITNESS 2**] testified that he was pressured by members of York's organization, however. On direct examination [**WITNESS 2**] testified that shortly before the trial his father and a man named Wilford Buckley, also known as "Tehaka," took him to a restaurant in Atlanta to meet York's attorney, Mr. Arora. [**WITNESS 2**] was 16 or 17 years old at the time. At this first meeting with Mr. Arora, [**WITNESS 2**] gave an account consistent with his statements to the FBI and his trial testimony. "When I first had the meeting," he explained to the jury, "I told them the truth, my statement." T-1340. After this meeting "Tehaka" became upset with him, because he had been expected to deny that any of the molestation happened. At a second meeting the next day, [**WITNESS 2**] met again with Mr. Arora and an investigator and denied any molestation. [**WITNESS 2**] also wrote a letter denying the molestation. He testified that Tehaka instructed him "on some parts of what to say." T-1343. The Government also admitted a letter written by [**WITNESS 2**] to his mother. Ex. 40. In that letter, [**WITNESS 2**] explained to his mother that Tehaka had threatened to reveal "dirt" on [**WITNESS 2**]'s mother and sisters that could cause them to go to prison. T-1378. He wrote:

24

So I was under the impression that y'all was going down unless I did something, so the next thing – the next night we met up again in the same spot, and against every bone in my body I told him – in parentheses "the lawyer" – it wasn't true. . . . I hopped on because all of y'all was doing it, and stuff like that.  But after thinking about it, I was like y'all still have to go on the stand with or without me.  After I realized that, it was too late.  This happened during December 19th, somewhere around that time.  I only did it because I thought y'all was in danger.  I guess we have to start ASAP to fix the situation.

T-1379.  There was no mention at trial, on direct or cross examination of any threats or intimidation by the Government.

In his present affidavit, dated July 12, 2007, **[*WITNESS 2*]** states that the majority of his testimony at trial was false and categorically denies witnessing or participating in any sexual activity with or involving York or any other adults in Eatonton or New York.  He states that he gave false testimony because of threats made by Agent Cronier and Assistant United States Attorney Richard Moultrie that his mother would be incarcerated for fraud.  **[*WITNESS 2*]** Aff. ¶ 7.  He now contends that he was fed stories by Cronier and Moultrie and that he "felt trapped to go along with the allegations in order to protect my family including my mother **[*REDACTED*]** and my sisters **[*REDACTED*]** and  **[*REDACTED*]** from threats of being incarcerated."  Id. at ¶ 9.

This testimony, coming more than three years after the trial, is at most material for impeachment, and it is of highly limited credibility.  **[*WITNESS 2*]** was thoroughly cross-examined at trial and was quite steadfast in his testimony.  It was established without dispute that he gave a statement on at least one occasion to York's attorney, denying any abuse or molestation.  There was no evidence that he mentioned any undue pressure from the Government to York's lawyer when he gave this statement.  Instead, on cross-examination York's attorney suggested that **[*WITNESS 2*]**

25

had told Mr. Arora he was pressured by his mother to testify against York.  T-1367.  [*WITNESS 2*] could not remember specifically what he stated at that meeting.  It is apparent from the record, however, that during this second meeting, surrounded by his father and Tehaka, [*WITNESS 2*] was in a place where he would have been free to make allegations that the FBI or the Government was coercing him to testify against York.  That he did not do so then, viewed in the light of his trial testimony that York's followers pressured him not to testify against York, makes his current statement of very limited credibility even as impeachment evidence.  It is not the sort of "new evidence" that would merit reopening the case.

### 3.    Affidavit of [*WITNESS 3*]

[*WITNESS 3*] was called by the Government and testified on the sixth and seventh days of trial, January 12-13, 2004.  She was not subpoenaed by the Government, but appeared voluntarily.  She told the jury that she had seen a television news story about the trial a week prior to her testimony and had decided, "I have to step up and give my testimony."  T-1765.  She had then approached Howard Sills, Sheriff of Putnam County, and expressed her interest in testifying.  No one from law enforcement or the Government had tried to contact her prior to her meeting with Sheriff Sills.  She testified that her first sexual encounter with York occurred in New York when she was 14 years old.  She was moved to Georgia when she was 15 years old, and continued to be molested by York at the Eatonton compound.  She also described witnessing York molesting numerous other children. At the time the molestation was taking place, she considered these sexual attentions from York to be "a privilege or honor."  T-1765.

In her present affidavit, [*WITNESS 3*] states that the majority of her testimony at trial was false.  She categorically denies having had sexual relations with York at any time before she turned

seventeen.  She  does affirm that York is the father of her child, but states that the child was born

when she was eighteen years old.  This contradicts her trial testimony, in which she stated that her

child was born on June 22, 1994, just over four months after her seventeenth birthday.  T-1760.

**[WITNESS 3]** testified that she left her child behind when she left the Eatonton compound in late

1996 or early 1997.  T-1763.  The child was two years old at the time.  At the time of the trial, the

child was still in the custody of York's followers in Eatonton.  In her affidavit **[WITNESS 3]** does

not allege that she was pressured to testify by the Government or law enforcement officers.  Instead,

she states that she was motivated to testify against York because of personal grudges:

> The reasons I testified untruthfully against Mr. York at trial is because I was
> personally angry at Mr. York.  I was angry because I felt at the time that I was
> mistreated, neglected and shunned by the father of my son.  I was jealous and
> envious of other women who had gained his favor and attention.  I was bitter at him
> because of the way he allowed me to be treated on the land and not allowed to leave.
> I was also bitter because I wanted to have fun and experience the things that life had
> to offer and Mr. York would not allow me.  I was vindictive and wanted to pay him
> back for the above perceived wrongs.

**[WITNESS 3]** Aff. ¶ 8.  She also states that she was afraid she would be prosecuted for neglect of

her child.  According to her affidavit, this fear was not based on any threats from law enforcement

or the Government, but arose because "[t]he community (Nuwaubians) and other mothers of children

on the land (404 Shady Dale Road) was saying that all persons who were involved and did not come

forward to help were going to be prosecuted for the neglect of their children."  Id. at ¶ 9.  Her

affidavit does state, however, that she felt pressured because the Government told her it was aware

of "some alleged bank fraud activities" involving her boyfriend.  At trial, allegations of bank fraud

and child neglect were raised by York's counsel on cross examination of **[WITNESS 3]**, not by the Government.

**[WITNESS 3]**'s affidavit, like **[WITNESS 2]**'s is at best an impeaching document.  Its credibility is minimal in comparison with her trial testimony.  In contrast to the detailed description of her experiences **[WITNESS 3]** provided at trial, her affidavit sets forth only a blanket retraction of her testimony.  It includes one clear misrepresentation of fact, in that it alleges that **[WITNESS 3]**'s child was born when she was eighteen years old, whereas the undisputed record as to **[WITNESS 3]**'s birthdate and the birthdate of her child indicates that she was just over four months past her seventeenth birthday when the child was born.  It also includes an unlikely explanation as to her reasons for coming forth with her allegations.  **[WITNESS 3]** states that she came forward because of rumors on the Nuwaubian compound that the Government intended to prosecute mothers for neglect if they did not assist in the case.  It is unclear how **[WITNESS 3]** could have been aware of these rumors prior to her appearance at trial, given that she had been estranged from the community and had left the compound some seven years earlier.

The affidavit does not allege any misconduct by the Government.  The circumstances of the case suggest that it is more likely that York's followers have pressured her in the years since the conclusion of the trial.  Like most of the victims in this case, **[WITNESS 3]** grew up thinking of York as a religious leader with special power and authority and for much of the time considered it a privilege to be the object of his special attentions.  At trial she was asked what she had read or been taught that made her feel it was a privilege to have sex with York.  She responded:

> You know, that this man is – he's not from this planet; and he has all this knowledge; he has royal blood, you know; and different – this was stuff that different tribes would do, you know.  It's a lot of stuff, you know – it's really hard.  I'm trying to, you know, put it in the

28

best way possible.  But, you know, basically that's what we was taught, you know.  And that's how it – it's a – it's a lot that we was taught, you know, from his books, from statements coming out of his mouth, you know. . . . He would say that he's Sudanese royalty.  I can't remember all of the names that he would name, but he would have the pictures and their names in his book, and he would say he was descended from these people.

T-1733.  The "book" to which **_WITNESS 3_** refers is "The Holy Tablets," a book of scripture dictated by York.  T-1760.  Some of the names York has gone by during his history and the course of this case include "Dr. York," "Dr. Malachi Z. York," "Atum Re," "Imam Issa," and "Maku, Chief Black Thunderbird (Eagle)."  The children often referred to him as "Baba," meaning Father.  In official documents filed in this Court he has represented himself as the chief of an Indian tribe, as the head of state of a sovereign nation, and as a diplomat from Liberia.

Numerous witnesses, including **_[WITNESS 3]_**, established that York had an immense degree of control over the lives of his followers, especially the children.  He decided where they lived.  He gave them new names.  He determined how much contact children could have with their parents or other family members.  He gave them work assignments, often involving long hours and never involving compensation.  It was apparent from the testimony of **_[WITNESS 1]_** on the Motion for New Trial that York's indoctrination continued to have an influence on his followers even long after they left the organization.

When **_[WITNESS 3]_** left the organization and the compound at the age of nineteen, she had no money, no clothes, and had not had contact with her family in years.  T-1764.  She left her two year old child behind.  At the time of trial, York's followers still had custody of **_[WITNESS 3]_**'s child, who was then nine years old.  The record does not show whether that child, now fifteen, is still living with York's followers.  These factors diminish yet further the credibility of **_[WITNESS 3]_**'s

recanting affidavit.  Viewed in light of these circumstances and in comparison to her testimony at trial, [**WITNESS 3**]'s present affidavit fails to justify the relief requested by York.

### 4.    Affidavit of [**WITNESS 4**]

The fourth and final recanting affidavit is from [**WITNESS 4**], who was called by the Government and testified on January 12, 2004, the sixth day of trial.  [**WITNESS 4**], often referred to as [**REDACTED**] testified that he was born into York's community and lived with the community during his entire childhood.  He was raised to think that York was an alien who had special powers. T-1449.  He moved from the upstate New York property to the Eatonton compound when he was twelve years old.  He testified that York first approached him shortly before his fourteenth birthday and invited him into a music studio in York's house, where he engaged in sexual activity with York and [**REDACTED**].  [**REDACTED**] was above the legal age of consent at the time.  [**WITNESS 4**] testified that York continued to molest him on eight or nine later occasions.  On one such occasion, [**WITNESS 4**] witnessed York engage in anal sex with [**WITNESS 5**], who was younger than ten at the time.  [**WITNESS 4**] described York's conduct during these encounters in unpleasant detail. He left the Eatonton compound in 2000, when he was sixteen years old.

Like [**WITNESS 2**] and [**WITNESS 3**], [**WITNESS 4**] has now submitted an affidavit in which he broadly states the majority of his testimony at trial was false and in which he denies engaging in any sexual activity with York or witnessing any sexual activity between York and other children.  He further testifies that he felt pressured to testify against York because FBI Agent Jalaine Ward told him, "Other people already came forth and we already know what happened and it's best that you do the same!"  [**WITNESS 4**] Aff. ¶ 7.

[*WITNESS 4*] makes no allegation of misconduct by the Government.  The alleged statement of Jalaine Ward set forth in the affidavit hardly constitutes improper pressure or the subornation of perjury.  On the contrary, it is common and acceptable police practice to confront a witness with the statements of other witnesses.  [*WITNESS 4*] makes no allegation that Ward or any other Government agent threatened or coerced him or knowingly asked him to give a false statement.  Ward's statement instead implies that the Government believed the statements of the other witnesses to be true.

[*WITNESS 4*]'s affidavit fails to justify collateral relief under Section 2255.  Like the affidavits of [*WITNESS 2*] and [*WITNESS 3*], [*WITNESS 4*]'s affidavit is at best a cumulative and impeaching document, an inconsistent statement given three and a half years after his trial testimony.  His affidavit presents a general retraction of very specific trial testimony.  His testimony at trial was tested through cross-examination referencing potentially inconsistent statements given during a medical examination and concerning various inconsistencies or gaps in his testimony.  The fact that he has now made a new, inconsistent statement is cumulative of other evidence in the case.  Numerous victims and other witnesses gave changing stories throughout the case: first alleging, then denying abuse; or first denying, then confirming abuse.  One example of such changing stories is [*WITNESS 2*], discussed above.  Another example is [*WITNESS 5*], who will be discussed below.  These different stories and the various motivations for them were carefully examined at trial, and the jury had the opportunity to evaluate them in light of the other witnesses' testimony and the witnesses' demeanor.

        5.      **Affidavit of [*WITNESS 5*]**

The affidavit of **[*WITNESS 5*]** is essentially a restatement of his testimony at trial and does not constitute new evidence.  Although **[*WITNESS 5*]** was called by the Government, on the witness stand he testified that he was never sexually abused by York and never witnessed York sexually abusing other children.  He testified that he considered York to be his father.  On the day that York was arrested, **[*WITNESS 5*]** was taken into custody by the Georgia Department of Family and Child Services.   **[*WITNESS 5*]** testified that DFCS caseworkers repeatedly asked him whether he had been molested.  In response he repeatedly denied any such activity.  He stated that the case workers told him, "We know this happened to you."  He also testified that other victims in the case, including **[*REDACTED*]** and **[*REDACTED*]** encouraged him to testify against York and expressed their expectation that they would receive money for their testimony.  These same facts are stated in **[*WITNESS 5*]**'s affidavit.  Although **[*WITNESS 5*]**'s affidavit contends that he was pressured by the Government to testify against York, it is apparent from his actions that he was not intimidated at trial and was prepared to give testimony on York's behalf.

**[*WITNESS 5*]**'s testimony at trial was contradicted by numerous witnesses.  DFCS case worker Janna Waddell testified that **[*WITNESS 5*]** told her York had "messed" with him for about three years, beginning when he was 7 or 8 years old.  T-1919.  Several other witnesses testified that they were present on occasions when York sexually molested **[*WITNESS 5*]**.  Others testified that **[*WITNESS 5*]** discussed York's sexual activity with them or that York expressed his interest in **[*WITNESS 5*]** to them.  The jury had a full opportunity to evaluate the testimony and demeanor of **[*WITNESS 5*]** and the other witnesses, and weigh their credibility in reaching its verdict.

**B.**     **Defense Witnesses**

York has presented the affidavits of three witnesses, who testified for the defense at trial. The affidavits of [*WITNESS 6*], [*WITNESS 7*], and [*WITNESS 8*] are consistent with their testimony at trial, and thus do not present "new evidence" to support York's collateral attack under Section 2255. Instead, a comparison of these affidavits with the witnesses' trial testimony confirms that York's theories of Government misconduct or of a conspiracy of disgruntled former Nuwaubians were thoroughly tested at trial. A number of witnesses for the defense, including [*WITNESS 7*] and [*WITNESS 8*], testified that Government agents raided their community, held them at gunpoint, and attempted to coerce them to give statements against York. Many of the law enforcement officers accused of this misconduct were also examined at trial. The jury had the opportunity to weigh the credibility of this evidence and its decision was consistent with the weight of the evidence.

### 1.      Affidavit of [*WITNESS 6*]

[*WITNESS 6*] was called by the defense and testified on day ten of the trial, January 16, 2004. [*WITNESS 6*] joined the community at age 8. T-2795. She testified at trial that she was never molested by York and that she never witnessed York molesting any other children. Her affidavit simply restates her trial testimony. Neither her affidavit nor her trial testimony sets forth any allegation of Government misconduct.

### 2.      Affidavit of [*WITNESS 7*]

[*WITNESS 7*] was called by the defense shortly after [*WITNESS 6*], on day ten of the trial. Her direct examination lasted approximately three minutes. At trial she testified that she was born into York's organization and had been a part of it her entire life. She stated that she had never been molested by York and never witnessed York molesting any children. On cross-examination she

admitted that on the day after York's arrest she told FBI agents that she had never met York.  On redirect she described the day of York's arrest as a terrifying raid on the Nuwaubian compound by dozens of masked, armed officers.  She testified that the agents yelled and pointed guns at her, but that no agent questioned her on the day of the raid.  T-2845.  She was taken to Milledgeville and questioned by officers the following day.  [*WITNESS 7*] testified that the officers insisted that York had molested her:

> They basically told us that he had molested us, because they kept on saying, "No, you're lying.  He had molested you.  You are just saying that because he threatened to kill you."  And they just went on and on.

T-2845-46.  According to [*WITNESS 7*], the officers pointed guns at her during the interview, and she thought she was going to be killed.  When asked whether she had denied knowing York at that interview, she responded:

> Yes.  That's because I was scared for my life.  Y'all had guns pointing at me.  And I didn't know – I wasn't even thinking right.  I was scared for my life.  I thought I was going to die that day.  I didn't know what to think.  I was trying to convince myself that it was a dream.  But after they said that Mr. York's been arrested, that's when I realized that it was not a dream.
>
> But the whole time, I was trying to convince to myself, "This is a dream. This cannot be happening to me.  Stuff like this don't happen in real life."
>
> I thought that stuff only happened in the movies, so I was scared for my life. Until this day, I still have nightmares about it.  It's scarred on me.  It's scarred on my soul.  And I try not to think about it, but I go to sleep and think about y'all pointing guns at me, and sometimes I even dream that y'all shoot me.

T-2846-47.  Despite this intense pressure and intimidation, [*WITNESS 7*] continued to tell the officers that she was never molested.  T-2846.  She maintained that position at trial and continues to maintain it in her present affidavit.

There is nothing in the affidavit of [**WITNESS 7**] that was not presented in greater detail at trial.  In addition, the defense presented a string of other witnesses to testify to the horrors of the raid on the Eatonton compound that took place on May 8, 2002.  The jury had the opportunity to weigh the credibility of this testimony and take it into account when evaluating the credibility of Government witnesses.

**3.     Affidavit of [*WITNESS 8*]**

[**WITNESS 8**] also testified on day ten of the trial.  Like [**WITNESS 6**] and [**WITNESS 7**], she denied that she had ever been molested by York or witnessed anyone else being molested by York.  She also testified at length about the raid on May 8, 2002:

> I was on my way down to the office, and I just seen cars, a bunch of cars coming in, people running and saying like, "Get in."  So I go to the office, and I look out the window, and I see a bunch of cars, the same thing, helicopters all over the place. And at the time, I just thought somebody was probably, you know, just trespassing on the land, that they're probably just coming to get, you know, somebody.  And then all you hear is glass breaking, you know, tear gas and all of that.   And that's when I started crying.  The guy had came upstairs, you know, with a gun pointed at us, was like, "Get on the floor, get on the floor," you know, "Put your hands up, sit on the floor, on your knees."
>
> And then one of the sisters had caught a asthma attack, and we was trying to get her aspirator, and then the guy was like, you know, "Everybody, you know, go outside with your hands up."
>
> And when I went outside, I saw helicopters; kids were crying; kids had their hands up.  I mean, everybody was out there.  And that's when I really just broke. And then, you know, we had to all go in this building, everybody together.  At the time, we still didn't know what was going on.   We just saw the whole scene and was just humiliated.

And then when we was in the building, one of the ladies had, you know, called my name, and I went to speak to them, and they still had guns in my face. And Jalaine Ward was asking me all these questions. It seemed like she was trying to get me to say something that didn't happen. And she had got mad when she didn't get the response that I guess she expected, and she was like, you know, "Well, [*WITNESS 8*], you know, you're not saying this now, but sooner or later, it will come out, because Mr. York is never coming out."

And, you know, then she started asking me questions about Disney World, just different things, and I was so scared, I just started saying anything because I wanted to get back into the building with my family, because they were standing right there with guns in my face, you know, crying, the whole bit. I was just blurting out anything just to get back in the room with my family.

T-2692-93. [*WITNESS 8*] testified that she was detained by the FBI for approximately eight hours, and was not released until around midnight that night. T-2696. Despite this intense pressure, [*WITNESS 8*] consistently denied any knowledge of molestation, during her interrogation, during trial, and in her present affidavit. Id. Her affidavit, like [*WITNESS 6*]' and [*WITNESS 7*]'s affidavits, is a restatement of her trial testimony. It presents nothing that was not presented to the jury.

**C.    Non-testifying Witnesses**

**1.    Affidavit of [*AFFIANT A*]**

York has submitted an affidavit from [*AFFIANT A*], a witness who was not called by the Government or the Defense at trial. In her affidavit she denies any molestation or knowledge of molestation by York, but she does not set forth any allegation of misconduct by the Government. There is no allegation in [*AFFIANT A*]'s affidavit that she ever met with law enforcement officers or with any representative of the Government. [*AFFIANT A*] states in her affidavit that she was

pressured by several of the other victims in the case to testify against York.  In Paragraph Two she states that she was called out of class one day to meet with "three other people" in her school's counseling office.  Although these people are not named in that paragraph of the affidavit, Paragraph Five indicates that they were **[*WITNESS 1*]**, **[*REDACTED*]**, and **[*REDACTED*]**.  According to **[*AFFIANT A*]**, these three asked her whether she was ever molested by York, and threatened to put her in jail or "file a whole bunch of papers" against her if she did not give a statement.  **[*AFFIANT A*]** Aff. ¶ 2.  After her meeting at the school, **[*AFFIANT A*]** "received constant phone calls and visits from many of them who had been angry with Dr. York for having all of us leave the land for many mischievous things we did."  **[*AFFIANT A*]** Aff. ¶ 5.  **[*AFFIANT A*]** states that she was never molested by York and has no knowledge of York having sexual contact with children.  Her affidavit is not evidence of Government misconduct and does not add anything to the record of this case that was not raised by other witnesses at trial.  Her testimony would have been merely cumulative.

### 2.    Affidavit of [*AFFIANT B*]

Although she did not testify at trial, **[*AFFIANT B*]** states in her affidavit that she gave a false statement to the FBI.  The reasons she gives for making this allegedly false statement, however, do not indicate improper conduct by the Government.  **[*AFFIANT B*]** states that she met with an FBI agent in Orlando, Florida, on March 25, 2002.  Her father was with her and "did most of the initial talking." **[*AFFIANT B*]** Aff. ¶ 2.  **[*AFFIANT B*]** alleges that her father had a grudge against York because he had not been allowed to visit his daughter at the compound in Eatonton.  He had been in contact with the Sheriff of Putnam County and had filed a civil suit against York related to his efforts to visit his daughter.  According to **[*AFFIANT B*]**, the FBI agent told her he knew what had

happened to her and gave her details of what other witnesses had said.  She contends that because of these statements she "felt pressured and coerced into cooperating with the F.B.I."  Id. ¶ 9.  She gives no detail as to any threats or intimidation by the FBI agent in Orlando and does not mention any other law enforcement or Government agents.  Her affidavit suggests that she was motivated to give  her statement because of her father's animosity towards York and because of her general intimidation at being in the presence of a law enforcement officer.  These motivations do not constitute a violation of York's due process rights.  Her affidavit is not evidence of Government misconduct and does not add anything to the record of this case that was not raised by other witnesses at trial.

IV.     **The Need for a Hearing**

No hearing is necessary on York's Section 2255 motion, because the motion and the files and the record of the case conclusively show that York is not entitled to relief.  The Report and Recommendation of the United States Magistrate Judge explains why no hearing is required as to York's claims of ineffective assistance of counsel.  As to York's claims regarding the various witness affidavits he has submitted, the bulk of the information set forth in the affidavits is cumulative of evidence presented at trial.

During three weeks of trial, York mounted a vigorous defense that included numerous alleged victims who denied abuse and numerous alleged victims who gave conflicting statements to law enforcement officers, health care providers, defense attorneys, and Government representatives.  York also presented several stories regarding the motivations of the witnesses who gave testimony or statements against him.  Through some witnesses he attempted to show that the prosecution against him was a  conspiracy orchestrated by his son, Jacob York.  He suggested that

other witnesses were induced to give false statements because of personal grudges against him or because of grudges held by family members.  Some were upset at having been expelled from the land.  Others were upset because York did not give them adequate attention.  Some witnesses contended that they gave statements against York because they were intimidated and coerced by law enforcement officers.  Of these, some alleged that officers pointed guns at their faces and demanded that they testify against York.  Others alleged that law enforcement officers or Government prosecutors threatened to prosecute them or their family members if they did not cooperate in the case.

The jury, and this Court, had extensive opportunity to evaluate the credibility of these statements at trial.  Based on the demeanor of the various witnesses, the medical and physical evidence, and other corroborating and impeaching evidence, the Court did not find York's various and shifting defenses to be credible.  Several of the victims who testified for the Government were quite compelling in their testimony.  In contrast, many of the alleged victims who testified for York and denied abuse were not credible.  Two of those witnesses, the twins **[*REDACTED*]**, had the credibility of their testimony completely shattered on cross-examination, when they were confronted with medical evidence of the molestation and attempted to explain that their injuries were caused by boyfriends they could barely remember.  After their cross-examination it was apparent that they had been induced by members of the organization to invent the "boyfriends" in order to explain the medical evidence of sexual abuse.  Other witnesses for York had such flat affects that they appeared to be reciting a script.

Throughout the case there was much evidence to indicate that the victim witnesses were under a great deal of pressure from York's followers.  All of the children in this case were raised to

think of York as a powerful religious leader, perhaps even a divine figure.  Many of the victims still had family members inside the York organization.  One victim's mother testified that her daughter was a liar and that she believed the word of York over the word of her child.  Another victim testified that his father and another man attempted to coerce him to give a statement to York's lawyers denying abuse.  [*WITNESS 1*] testified in court that she was induced to give a false affidavit simply out of concern for her "Baba."  Taking this evidence into account, along with the provisions of the affidavits themselves, the Court finds that the affidavits offered by York are lacking in credibility and do not indicate any violation of York's due process rights.  There is no reason to give York an opportunity to present the same witnesses and the same evidence a second time.

For the reasons set forth above and in the Report and Recommendation of the United States Magistrate Judge, York's Motion to Vacate, Set Aside, or Correct Sentence (Doc. 382) and his Amended Motion (Doc. 384) are **DENIED**.  No hearing is required on the Motions.

## V.    Miscellaneous Motions

Since the filing of the Objection to the Report and Recommendation, York and his followers have filed dozens of additional documents in this Court.  A number of these are labeled as "Judicial Notice" documents and do not request any specific relief.  Eleven are motions by or on behalf of York, seeking various forms of relief.  These motions are disposed of below.

### A.    Motion for Special Appearance Evidence Hearing (Doc. 413)

York's Motion for Special Appearance Evidence Hearing is incomprehensible and does not appear to request any specific relief.  To the extent, however, that it seeks an evidentiary hearing on York's Section 2255 Motion, it is **DENIED**, for the reasons set forth above.

### B.    Pro-se Motion for Writ of Habeas Corpus for Indigenous Peoples (Doc. 420)

York's Pro-se Motion for Writ of Habeas Corpus for Indigenous Peoples is **DENIED**, as it is frivolous.

### C.      Pro-se Motion for Relief by Recantations of Alleged Victims (Doc. 422)

York's Pro-se Motion for Relief by Recantations of Alleged Victims restates and expands on arguments set forth in York's Objection to the Report and Recommendation, and it is **DENIED**, for the reasons set forth above.

### D.      Pro-se Motion by Judicial Notice for Evidenced Judicial Misconduct (Doc. 423)

York's Pro-se Motion by Judicial Notice for Evidenced Judicial Misconduct restates and expands on arguments set forth in York's Objection to the Report and Recommendation, and it is **DENIED**, for the reasons set forth above.

### E.      Pro-se Motion to Vacate Sentence Due to Lack of Jurisdiction (Doc. 426)

York's Pro-se Motion to Vacate Sentence Due to Lack of Jurisdiction is **DENIED**, as it is frivolous.

### F.      Pro-se Motion by Evidence for Mandatory Judicial Notice in Lieu of Misnomer Dwight York a/k/a Dwight Totten (Doc. 427)

York's Pro-se Motion by Evidence for Mandatory Judicial Notice in Lieu of Misnomer Dwight York a/k/a Dwight Totten is **DENIED**, as it is frivolous.

### G.      Motion to Unseal Document (Doc. 437)

York's Motion to Unseal Document Number 419 is **DENIED**.  Document 419 is an order regarding restitution to one of the victims in the case, and is filed under seal pursuant to 18 U.S.C. § 3509(d).

### H.      Motion to Unseal Document (Doc. 438)

York's Motion to Unseal Document Number 436 is **DENIED**.  Document 436 is an order regarding restitution to one of the victims in the case, and is filed under seal pursuant to 18 U.S.C. § 3509(d).

I.      **Pro-se Petition in the Nature of a Motion for Protection Order (Doc. 439)**

In his Pro-se Petition in the Nature of a Motion for Protection Order, York asks the Court to issue an order directing the Bureau of Prisons "to cease and desist from any attempts of any medical examinations I have not agreed to regarding any matters to remedies I seek."  M. for Protection Order 2 (Doc. 439).  This Court is not the appropriate forum and this case is not the appropriate action in which to challenge York's conditions of confinement.  The Motion is **DENIED**.

J.      **Pro-se Motion in the Nature of a Motion to the Court for Knowledge (Doc. 440)**

York's Pro-se Motion in the Nature of a Motion to the Court for Knowledge is **DENIED**, as it is frivolous.

K.      **Motion to Vacate Under 28 U.S.C. § 2255 (Doc. 442)**

York's Motion to Vacate Under 28 U.S.C. § 2255 restates and expands on arguments set forth in York's Objection to the Report and Recommendation, and it is **DENIED**, for the reasons set forth above.  To the extent that it states new arguments or claims, it is a successive petition and this Court has no jurisdiction to hear it without permission from the Eleventh Circuit Court of Appeals, pursuant to 28 U.S.C. § 2244(b)(3)(A).

VI.   **Filing Under Seal**

Because this Order contains the names and substantial personal information, including sexually explicit matters, regarding children who were or were alleged to be victims of crimes of physical abuse, sexual abuse, or exploitation, this Order shall be filed under seal pursuant to the

provisions of the Child Victims' and Child Witnesses' Rights Statute, 18 U.S.C. § 3509(d).   As such, the contents of this Order may be disclosed only to the Defendant, the Defendant's attorneys, the attorneys for the Government, and employees of the Court.   These parties are instructed to maintain the confidentiality of the information set forth herein as required by 18 U.S.C. § 3509(d)(1).

**SO ORDERED** this 30th day of July, 2009.


S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

chw