IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

UNITED STATES OF AMERICA
     Plaintiff,

vs.                                   No. 5:02-cr-00027-CAR-CHW-1

DWIGHT YORK,
Register Number: 17911-054
     Defendant.

## DEFENDANT'S EMERGENCY MOTION FOR NARROWLY TAILORED PROTECTIVE ORDER REGARDING EXTRAJUDICIAL STATEMENTS BY THE GOVERNMENT, THEIR AGENTS, WITNESSES, AND AFFILIATES

COMES NOW Defendant Malachi York, Consul General Diplomatic #0003125, of the Republic of Liberia, West Africa Citizenship, misnomer Dwight D. York (Inmate #17911-054) by and through undersigned counsel. It respectfully moves this Court for a narrowly tailored protective order prohibiting further prejudicial extrajudicial statements by the Government, investigators, witnesses, agents, spokespersons, affiliates, and other covered law-enforcement participants concerning disputed facts, alleged evidence, witness credibility, punishment, release, future detention, or any other matter reasonably likely to materially prejudice proceedings, influence witnesses, inflame public hostility, or undermine the fair administration of justice.

## I. INTRODUCTION

Courts have the inherent authority to control the proceedings before them. *Rasmussen v. Cent. Florida Council Boy Scouts of America, Inc.*, D.C. Docket No. 6:07-cv-01091-PCF-GJK, No. 10-12238 (11th Cir. Feb 02, 2011). This request is not directed to the press or the public generally. Defendant does not seek a media gag order. Defendant seeks only a participant-directed order grounded in this Court's inherent and statutory authority to control proceedings before it and to

prevent obstruction, prejudice, and interference with the orderly administration of justice. See

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976); *Sheppard v. Maxwell*, 384 U.S. 333 (1966);

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991); *News-Journal Corp. v. Foxman*, 939 F.2d

1499 (11th Cir. 1991).

## II. FACTUAL BASIS

This motion is not based upon a single isolated remark. The current public record, together

with the case materials and report provided to counsel, reflects a longstanding pattern in which

Sheriff Howard R. Sills, a government witness who testified in opposition to Mr. York's request for

bail, has acted not merely as a law-enforcement participant but as a continuing public commentator

on the York matter and related proceedings. The public record shows repeated public commentary

by Sills over many years concerning York, the Nuwaubians, the investigation, the prosecution, and

the continuing significance of the case. Publicly accessible reporting places Sills in that role in at

least 2002, 2003, 2013, 2021, and 2026, with additional documentary and retrospective appearances

in between. See, e.g., the 2002 SPLC reporting, the 2003 Trinity archive article, the 2013 11Alive

reporting, the 2021 WGXA retrospective, and the 2026 13WMAZ release-story reporting.

A. Recent History

Most recently, public reporting indicates that Sheriff Sills made highly inflammatory

statements in response to York's request for compassionate release. According to 13WMAZ, Sills

described York in extreme terms, discussed the original Georgia indictment, invoked alleged

victim-impact themes, stated that York may have to return to Putnam County if released, and

expressed the hope that York would not be released at all. The same report quotes Sills as saying

that, during the investigation, he 'learned to carry a bigger gun.' These are not neutral procedural

2

comments. They are advocacy-style statements by a law-enforcement participant that are reasonably likely to inflame public sentiment, shape public understanding of disputed matters, and prejudice present or future proceedings. The prejudice is sharpened by the internal contradiction in the same interview: Sills publicly invoked the language of victim certainty and continuing state exposure while also stating that York has not been sentenced on state charges and may still have to come to Putnam County. If, by Sills's own account, unresolved state matters remain, then public statements treating those matters as conclusively established only underscore the risk of prejudice, venue contamination, and improper official influence outside the courtroom.

The public sequence of events also gave rise to concern that information tied to the pending compassionate-release matter reached local media notwithstanding efforts to proceed under seal. Defendant does not ask this Court, on the present motion, to determine who disclosed any particular filing. Defendant instead shows that compassionate-release-related judicial activity was followed by highly public local reporting featuring Sheriff Sills, and that counsel of record was later replaced after attorney-withdrawal proceedings. That sequence underscores the need for a narrowly tailored order preventing further public commentary by covered participants concerning compassionate release, punishment, future detention, and other disputed matters while judicial proceedings remain pending.

B. Past History

Related record materials surrounding the June 30, 2003, plea proceedings further underscore the risk of prejudice posed when sensitive York-related proceedings entered public circulation before adjudicative issues were settled. At the June 30, 2003, hearing in *United States v. York*, the Court stated on the record that the plea agreement had been rejected and that the immediate issue before

the Court was whether Mr. York would withdraw his guilty plea and proceed forward. The separate case-history materials submitted with this motion further state that immediately after the closed-courtroom session, video of the plea was released publicly online, and that the resulting publicity tainted jury pools, contributed to repeated venue instability in York-related proceedings, and amplified prejudicial public framing of the case before trial. Defendant offers these record materials not to ask this Court to resolve every historical dispute about disclosure, but to show that public dissemination of sensitive York-related proceedings has long posed a concrete prejudice problem and that renewed participant-driven publicity today threatens to recreate the same harm.

Publicly indexed federal court materials also show that Mr. York currently has a compassionate release matter pending in this Court. Publicly accessible docket materials reflect that a compassionate-release motion was filed on February 3, 2026, and later public docket indexing reflected additional sealing-related filings and counsel-withdrawal activity in early April 2026. See, e.g., Case 5:02-cr-00027-CAR-CHW, Document 553, filed 02/03/26; see also publicly indexed order-to-supplement materials reflecting that attorney Judith Delus Montgomery filed a motion to withdraw in connection with the pending compassionate-release matter. Defendant offers this sequence not to litigate the merits of those federal filings here, but to show that release-related proceedings were active and that sensitive release-related developments became the subject of public circulation.

The public record also shows a broader pattern of escalation and public-intimidation rhetoric unrelated to neutral case administration. In June 2023, WSB-TV reported that Sheriff Sills said he shot at the front tire of a truck during an encounter at his residence involving men offering to sell pine straw, and Sills was quoted as saying, 'I knew exactly what I was doing, and I'd do it again.'

That report is relevant here not because it proves any element of the underlying criminal case, but because it tends to show a public law-enforcement style rooted in force, confrontation, and approval of escalatory tactics.

Likewise, the public record shows that in February 2018, while serving as president of the Georgia Sheriffs' Association, Sills publicly attacked Governor Nathan Deal's criminal-justice reform agenda by saying the governor had done 'more for those who perpetrate crime than Lucifer and his demons combined.' The reporting further states that the reforms at issue included expanded judicial discretion, reduced reliance on incarceration for lower-level offenders, and increased reentry and rehabilitation measures. Public reporting also states that the controversy led to Sills's resignation from the presidency of the Georgia Sheriffs' Association. That episode is relevant because it shows a public, vocal, and official stance against reform-oriented criminal justice measures and a preference for punitive rhetoric in matters directly related to detention and release policy.

The Southern Poverty Law Center also appears in the early public media history of the York matter. Publicly accessible SPLC reporting from 2002 and 2003 treated York and the Nuwaubian organization as a subject of national coverage. Defendant includes SPLC here only as an example of an early outlet participating in the broader media environment surrounding the York matter. Defendant does not ask this Court to resolve broader collateral disputes about SPLC outside the scope of this motion.

Additional mainstream and streaming references reinforce the same point. Public listings and streaming pages show York-related content on Hulu, People Magazine Investigates: Cults, Investigation Discovery, and related national true-crime distribution channels. Those listings matter here not because they are offered as evidence of the truth of every allegation contained in them, but

because they show that the York matter has repeatedly been presented to broad national audiences through crime-focused media products, thereby increasing the prejudicial impact of any further commentary by official local participants.

A specific example is the Law&Crime Network YouTube publication titled 'Cult Leader's Horrific Child Abuse Inside Pyramids Exposed,' which is expressly framed around Mr. York and the Eatonton allegations. Regardless of the source platform's editorial rights, the existence of a York-specific episode on a channel with millions of subscribers shows how widely it's being shared. It's important to prevent covered law-enforcement participants from adding further inflammatory commentary to an already-amplified media environment.

The scale of modern republication also matters. Law&Crime Network is a major law-focused media channel with approximately 7.57 million YouTube subscribers. When York-related allegations or commentary are repeated through a platform of that size — especially one devoted specifically to crime-and-law audiences — the resulting amplification extends far beyond local circulation in Middle Georgia. It can reach a massive national and international audience. The prejudice risk is therefore not limited to a single local article or television segment; digital distribution, clipping, recommendation algorithms, and cross-platform sharing magnify it.

The case-history materials also reflect that the conflict between Sheriff Sills and Dr. York's community predates the May 2002 arrest by years. The report references repeated zoning and land-use conflict, identifies civil matters including Superior Court of Putnam County Case No. 99-CV-1, Superior Court of Putnam County Case No. 98-CV-136-5, and Superior Court of Putnam County Case No. 98-CV-393-12, Case No. 5:03-CV-22(CAR), and describes them as part of a longer-running enforcement conflict involving the 404 Shady Dale Road, Eatonton, Georgia,

property and related residents.

Public reporting independently corroborates, at least in part, the broader background fact that Sheriff Sills first took on the Nuwaubians through zoning disputes in the late 1990s and that the conflict escalated over several years before the raid and prosecution. See Los Angeles Times, Jan. 22, 2004 ('Putnam County Sheriff Howard Sills first challenged the Nuwaubians in a zoning dispute.'). See also the report's reference to those Putnam County civil matters. Public reporting from 2002 also shows Sills speaking publicly about the raid and the tactical approach to the York property. Contemporary news coverage reported Sills discussing a plan to strike rapidly with a large force, and other reporting quoted Sills on the forced entry through the compound gate. Those facts matter because they show that Sills has not merely been a quiet institutional participant; he has repeatedly used public media channels to frame the York matter in his own narrative.

Additional public reporting further confirms the long-running nature of Sheriff Sills's public association with York-related commentary. In 2013, 11Alive quoted Sheriff Sills in a York/Nuwaubian-related story. In 2021, WGXA published a retrospective in which Sheriff Sills again discussed York, the raid, and the compound. In July 2018, PEOPLE published multiple features on York and the Nuwaubian Nation, including a story in which Sheriff Sills was quoted as telling PEOPLE that the group claimed they were not subject to local law and that building inspectors were met with guns. Those PEOPLE pieces were tied to the Investigation Discovery program People Magazine Investigates: Cults, specifically the July 9, 2018 episode 'The Nuwaubian Nation of Moors,' which publicly amplified the York matter to a national audience. These materials do not all carry equal weight, but collectively they show continuity and repetition rather than isolated comment.

Finally, the report states that Sheriff Sills's conduct should be evaluated against an additional pattern that includes his role as both investigator and public narrator, his prior references to Dr. York's claimed Liberian status, and Superior Court of Putnam County civil-file and property-enforcement matters predating arrest. To the extent those items are supported in the case materials and attached exhibits, Defendant relies on them here not to ask this Court to resolve every historical dispute, but to show that the present request arises against a long-established backdrop of public commentary, pretrial-publicity activity, and adversarial entanglement by a law-enforcement government witness.

## C. Timing matters

The April 3, 2026, 13WMAZ article publicly discussed Mr. York's compassionate release motion, quoted Sheriff Sills at length, and attributed to him statements that York was a 'serial rapist' and 'child molester,' that he hoped York would not be released, and that York might still have to return to Putnam County if released. In the same article, however, Sheriff Sills also stated: 'He's never been sentenced on these charges,' while simultaneously invoking alleged victims and urging continued detention. That combination is relevant to the present motion because it illustrates prejudicial public advocacy by a law-enforcement participant in unresolved or still-claimed federal matters while characterizing those same matters in categorical and inflammatory terms. It is precisely the kind of public commentary that risks shaping venue, public sentiment, and witness expectations outside the courtroom.

## III. LEGAL STANDARD

District courts are in a superior position to decide whether to enter or modify protective orders, and it is well established that "the decision as to access is one best left to the sound discretion

of the trial court...." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); accord *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 790 (1st Cir.1988) ("Control of pretrial discovery, including the entry or modification of a protective order, is a matter falling peculiarly within the discretion of the district court."); *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 147 (2d Cir.1987) ("Whether to lift or modify a protective order is a decision committed to the sound discretion of the trial court."). *Fed. Trade Comm'n v. Abbvie Prods. LLC*, 713 F.3d 54 (11th Cir. 2013).

Federal law places the heaviest constitutional burden on prior restraints directed to the press. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976). This motion does not seek such relief. Materially prejudicial participant speech may be restrained under a substantial likelihood-of-material-prejudice standard. *Sheppard v. Maxwell*, 384 U.S. 333 (1966), confirms the trial court's duty to protect fair-trial interests against prejudicial publicity. *News-Journal Corp. v. Foxman*, 939 F.2d 1499 (11th Cir. 1991), likewise reflects the legitimacy of participant-focused restraints in an appropriate case.

## IV. ARGUMENT

The present record shows a substantial likelihood of material prejudice if Sheriff Sills and other covered law-enforcement participants continue making public statements about disputed facts, punishment, compassionate release, witness-related themes, or emotionally charged interpretations of the York matter. Statements by a sheriff carry special weight because the public reasonably perceives them as informed by official access, investigative authority, and institutional credibility. When those statements extend beyond neutral public-record recitation and into inflammatory advocacy, they risk shaping public sentiment, affecting venue, influencing witnesses, and pressuring

future proceedings outside the courtroom.

Less restrictive measures are not adequate on this record. Continuances, and venue remedies all address the consequences of publicity after it occurs. They do not stop the continued participant-driven public litigation of the case by official actors. Nor has informal criticism deterred the conduct. To the contrary, the public record shows repeated recurrence of the same pattern over many years, including in 2026.

The order requested here is narrowly tailored. Defendant does not seek to bar all speech. Defendant does not seek to restrain the press. Defendant seeks only a participant-directed order prohibiting covered law-enforcement and hearing participants from making public statements about disputed facts, witness credibility, guilt, punishment, compassionate release, future detention, alleged evidence, or any other matter reasonably likely to materially prejudice proceedings or inflame public sentiment in a way that interferes with justice.

## V. REQUEST FOR RELIEF

WHEREFORE, Defendant respectfully requests that this Court enter a narrowly tailored order providing that Sheriff Howard R. Sills, members of the Putnam County Sheriff's Office, investigators, spokespersons, agents, witnesses, and other covered hearing participants shall not make, authorize, encourage, or facilitate any extrajudicial statement reasonably expected to be publicly disseminated if that statement concerns disputed facts, alleged evidence, witness credibility, punishment, compassionate release, future detention, or any other matter reasonably likely to materially prejudice proceedings, affect venue, influence witnesses, inflame public hostility, or undermine the fair administration of justice.

Defendant further requests such other and further relief as the Court deems just and proper.

This is the 1st day of June 2026.

Respectfully submitted,

DWIGHT YORK,
Register Number: 17911-054

By:

s/ Imhotep Alkebu-lan
Imhotep Alkebu-lan GB #602826

Post Office Box 54863
Atlanta, Georgia 30308
404-855-4646 Telephone
404-254-0701 Telecopier
ialkebulan@aol.com

Attorney for Defendant

## CERTIFICATE OF SERVICE

This is to certify that on the date below, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

This is the 1ST day of June 2026.

s/ Imhotep Alkebu-lan
Imhotep Alkebu-lan

11